Matter of 530 Second Ave. Co., LLC v Zenker (2018 NY Slip Op 02143)





Matter of 530 Second Ave. Co., LLC v Zenker


2018 NY Slip Op 02143


Decided on March 27, 2018


Appellate Division, First Department


Moulton, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 27, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Richard T. Andrias, J.P.
Ellen Gesmer
Cynthia S. Kern
Anil C. Singh
Peter H. Moulton, JJ.


570431/14 5827 

[*1]In re 530 Second Ave. Co., LLC, Petitioner-Respondent,
v
Lillian Zenker, Respondent-Appellant.



Respondent appeals from the order of the Appellate Term, First Department, entered March 2, 2017, which affirmed a final judgment of the Civil Court, New York County (Sabrina B. Kraus, J.), entered on or about February 10, 2014, after a nonjury trial, awarding possession of the rent-stabilized apartment to petitioner landlord.




The Price Law Firm LLC, New York (Heather Ticotin, Joshua C. Price and Jennifer Zirojevic of counsel), for appellant.
Belkin Burden Wenig & Goldman, LLP, New York (Magda L. Cruz, Sherwin Belkin and Brian Clark Haberly of counsel), for respondent.



MOULTON, J.


Respondent (Zenker) in this appeal argues that she is entitled to succession rights in the rent-stabilized apartment which has been her home since 2003. She contends that she was a "family member," as that term is defined in the Rent Stabilization Code, of the tenant of record (Montgomery). Montgomery died in 2011. Petitioner landlord (landlord) contends that Zenker was a mere licensee at the apartment and the death of the tenant of record terminated her right to reside there. After a trial, Housing Court found that Zenker had not carried her burden to prove that she has a right to succeed to the tenancy. Appellate Term affirmed, with one Justice dissenting. We granted leave to appeal and now reverse.
Approximately 30 years ago, in Braschi v Stahl Assoc. Co. (74 NY2d 201 [1989]), the [*2]Court of Appeals recognized the rights of nontraditional family members to succeed to rent-regulated apartments and held:
"[W]e conclude that the term family, as used in 9 NYCRR 2204.6(d) should not be rigidly restricted to those people who have formalized their relationship by obtaining, for instance, a marriage certificate or an adoption order. The intended protection against sudden eviction should not rest on fictitious legal distinctions or genetic history, but should find its foundation in the reality of family life"
(id. at 211).
The Braschi Court cited eight factors to aid in that determination, but stressed that "the presence or absence of one or more of them is not dispositive since it is the totality of the relationship as evidenced by the dedication, caring and self-sacrifice of the parties which should, in the final analysis control" (id. at 213). In response to Braschi, the rent stabilization regulations were amended to list certain factors that may be considered in determining whether a person qualifies as a family member for succession purposes.[FN1]
The totality of the circumstances in this case demonstrates that Zenker qualifies as a family member of Montgomery and thus qualifies for succession rights.[FN2]
The conclusion of Housing Court that Zenker failed to establish that she was a family member could not be reached under any fair interpretation of the record. While the factual findings of the trial court are given deference, particularly because such findings often rest on the credibility of witnesses (see WSC Riverside Dr. Owners LLC v Williams, 125 AD3d 458 [1st Dept 2015]), the trial court did not make any credibility findings against Zenker. Instead, in its terse decision, Housing Court held that Zenker did not meet her burden of proof and, without articulating its reasoning or discussing the statutory factors, the court concluded that the couple were merely "friends, roommates and business colleagues." Housing Court also improperly focused on Zenker's "own admission" that she and Montgomery were not "romantically involved" after the end of their nine year "romantic relationship." It was error for the trial judge to consider this testimony as "[i]n no event would evidence of a sexual relationship . . . be required or considered" (9 NYCRR 2520.6[o][2]).[FN3]
Landlord maintains that the Housing Court decision should be upheld given the "absence" of evidence and the "deficient documentation." However, the evidence received paints a picture of a couple who exhibited many of the behaviors associated with a traditional marriage. Moreover, the absence of documentary evidence does not undermine a succession rights claim when the totality of the testimonial evidence, as here, establishes the requisite emotional and financial commitment (see Arnie Realty Corp. v Torres, 294 AD2d 193 [1st Dept [*3]2002]).
Zenker was unrepresented during the two day trial. Nearly the entire 151 page transcript reflects Zenker's efforts to have documents admitted into evidence in order to establish that she lived with Montgomery in the apartment, as her primary residence, for at least two years prior to his death. The record is cluttered with landlord's counsel's objections to nearly every single piece of evidence that she sought to introduce [FN4]. When it came time for Zenker to provide narrative testimony, her account of the nature of her relationship with Montgomery spanned only 3 1/2 pages of the 151 page transcript.
Zenker testified that she met Montgomery, who was her fencing instructor, on January 26, 1979. Within a few months of "kind of hanging out," they became romantically involved and she moved into the apartment in July 1979. She testified that after "about nine and one half years, we kind of broke up" and she moved to her own apartment in 1988. However, she testified that they "stayed friends" and she visited him two or three times per week for the next 15 years. She moved back into the apartment in 2003 because she was living in an illegal basement apartment and Montgomery offered her shelter.
Once she moved back the couple exhibited many of the behaviors associated with a traditional marriage. Zenker testified that she took care of all of the domestic chores (cooking, cleaning and laundry), while Montgomery took care of the household expenses (rent, utilities and food). He also paid for dinner at restaurants once a week. Zenker was financially dependent on Montgomery for her employment as she testified that she worked solely for him in his home business from 2003 until his death - as one might do in a family business. Zenker testified that they also accompanied each other to doctor appointments - much like a married couple might do.[FN5]
The couple's living arrangements also reflected their dedication, caring and sacrifice. When counsel cross-examined Zenker, she explained that Montgomery slept in the living room on the couch, while she slept in the bedroom. Montgomery's sacrifice in moving to the couch in the living room, despite being the sole rent-payer, is inconsistent with a mere roommate relationship.
While the record shows that Zenker had her own checking account at GreenPoint Bank in 2005 and maintained her own credit cards and cell phone during the two year period before Montogmery's death, other evidence demonstrates that the couple intermingled funds. The record contains joint bank account statements from Capital One Bank for the period July 22, 2009 through August 20, 2010. Although the evidence reflects that some checks from that account were printed in Montgomery's name, the Capital One Bank account was nevertheless a joint account.
The record also includes an itemized funeral home document bearing the signature "Lillian Zenker." The handwritten word "Wife" appears below the signature "Lillian Zenker" and next to the typed words "Relation to Deceased." Additionally, initials appear between the typed words "Initial and state your relation to deceased" and the handwritten word "Wife" in two other places on the document. In response to counsel's cross-examination about this document "The two of you weren't married, were you?" Zenker responded, "No, no. And it was just a mistake." Zenker's cryptic reference to a "mistake" however, does not negate the fact that the designation "Wife" was used in three separate instances. True, Zenker and Montgomery were not married, but as Braschi held years ago, family "should not be rigidly restricted to those people who have formalized their relationship by obtaining, for instance, a marriage certificate" (Braschi, 74 NY2d at 211).[FN6]
The couple's dedication, caring and sacrifice are also reflected by Zenker's chance testimony in response to landlord's counsel's voir dire [FN7]. Because Zenker had sought to introduce only copies of photographs, counsel questioned Zenker about the location of original photographs. Zenker explained that the photographs (which were from the relationship's early years) were in her closet at home because she did not want "them to be thrown around or get bent or damaged in any way." One would not ordinarily expect that a "friend, roommate and business colleague" would so carefully guard and retain such photographs for over 30 years.
Landlord correctly points out that the record contains no evidence that the couple executed wills. Nonetheless, there was uncontradicted evidence that Montgomery wanted to provide for Zenker after he died. Zenker testified that before she moved back into the apartment, Montgomery had sent her a list of the location of the "valuable stuff" in the apartment so she could "have everything" and he could "do right" by her. Zenker also testified that she believed that she was the beneficiary of Montgomery's 401(k) account and thought that she received a check from his IRA, but was not successful in having any documents admitted on this point.
The fact that Zenker moved back into the apartment in 2003 because of her own housing problems, and the couple's lack of sexual intimacy, does not diminish their relationship to that of roommates. The unrefuted evidence establishes that this couple shared decades of dedication, caring and self-sacrifice. Consideration of the factual record in light of the factors listed in the Rent Stabilization Code demonstrates that Zenker was family to Montgomery.
Accordingly, the order of the Appellate Term, First Department, entered March 2, 2017, [*4]which affirmed a final judgment of the Civil Court, New York County (Sabrina B. Kraus, J.), entered on or about February 10, 2014, after a nonjury trial, awarding possession of the rent-stabilized apartment to petitioner landlord, should be reversed, on the law, without costs, the final judgment of possession vacated, and the proceeding dismissed.
All concur.
Order, Appellate Term, First Department, entered March 2, 2017, reversed, on the law, without costs, the final judgment of possession vacated, and the proceeding dismissed.
Opinion by Moulton, J. All concur.
Andrias, J.P., Gesmer, Kern, Singh, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: March 27, 2018
CLERK



Footnotes

Footnote 1:Those factors include, but are not limited to:
"(i) longevity of the relationship;
"(ii) sharing of or relying upon each other for payment of household or family expenses, and/or other common necessities of life;
"(iii) intermingling of finances as evidenced by, among other things, joint ownership of bank accounts, personal and real property, credit cards, loan obligations, sharing a household budget for purposes of receiving government benefits, etc.;
"(iv) engaging in family-type activities by jointly attending family functions, holidays and celebrations, social and recreational activities, etc.;
"(v) formalizing of legal obligations, intentions, and responsibilities to each other by such means as executing wills naming each other as executor and/or beneficiary, granting each other a power of attorney and/or conferring upon each other authority to make health care decisions each for the other, entering into a personal relationship contract, making a domestic partnership declaration, or serving as a representative payee for purposes of public benefits, etc.;
"(vi) holding themselves out as family members to other family members, friends, members of the community or religious institutions, or society in general, through their words or actions;
"(vii) regularly performing family functions, such as caring for each other or each other's extended family members, and/or relying upon each other for daily family services;
"(viii) engaging in any other pattern of behavior, agreement, or other action which evidences the intention of creating a long-term, emotionally committed relationship" (9 NYCRR 2520.6[o][2]).

Footnote 2:In this appeal, landlord does not contest that Zenker lived in the apartment with Montgomery as her primary residence for the requisite two-year period prior to his death on July 21, 2011. Therefore, the only issue is whether Zenker established that she was a nontraditional family member during this period.

Footnote 3:Landlord attempts to diminish the significance of Housing Court's reference to the lack of a "romantic relationship" because the judge did not use the words "sexual relationship." The judge's description however, stems from Zenker's testimony. Zenker described when she first met Montgomery and "just started kind of hanging out sometimes as friends" but within a few months "kind of became romantically involved." However, when Zenker moved back in to the apartment in 2003, she testified that "I moved back in just platonically." Thus, the trial judge's reference to Zenker's "own admission" can only refer to their lack of a sexual relationship after 2003.

Footnote 4:Landlord objected over 65 times to Zenker's attempts to admit documents into evidence. Counsel even made repetitive objections to admission of evidence as uncontroversial as copies of photographs of the couple. The trial judge suggested to counsel that it might be a waste of time to spend "weeks" on Zenker's proof of cohabitation if landlord had no evidence to contradict that claim.

Footnote 5:On appeal, landlord heavily relies on Zenker's deposition testimony - the very same testimony to which it objected at trial, and which the trial judge excluded. For instance, landlord highlights that Zenker testified at her deposition that she and Montgomery introduced themselves to others as "friends" or "good friends." However, Zenker also testified that they considered themselves "married" and that her sister considered Montgomery as part of the "family." In any event, the trial judge could not have relied on any aspect of the deposition, because she excluded that evidence at trial. Therefore, we may not consider the deposition on appeal.

Footnote 6:While landlord acknowledges Braschi, as it must, it also contradicts the holding of that case by faulting Zenker for not formalizing her relationship through marriage, parenting a child, or entering into a domestic partnership.

Footnote 7:The trial judge referred to the document phase of the trial and the nondocument phase of the trial. Zenker was under oath, and allowed to testify, during both phases.